Richard Robert RADCLIFFE; Charles Melvin Taylor; Andrew Slivka, Jr.; Jay Streets, Plaintiffs–Appellants,

v.

RAINBOW CONSTRUCTION COMPANY, a partnership; Peter A. Richardson; Douglas V. Anderson; Clifford Michael McClure; Melon L. Chichester; James W. Lambert; Christian Hans Weissleder; Ukiah Unified School District; Jack Daniels, individ-

ually in his personal capacity, and as Assistant Superintendent of Schools and Consultant to the Ukiah Unified School District, Defendants–Appellees.

Richard Robert Radcliffe; Charles Melvin Taylor; Andrew Slivka, Jr.; Jay Streets, Plaintiffs–Appellants,

v.

Rainbow Construction Company, a partnership; Peter A. Richardson; Douglas V. Anderson; Clifford Michael McClure; Melon L. Chichester; James W. Lambert; Christian Hans Weissleder; Mendocino County; Susan Massini, individually in her personal capacity; Allen F. Bazzani, individually in his personal capacity and as Manager of Building & Grounds of the County of Mendocino; Jack Daniels, individually in his personal capacity, and as Assistant Superintendent of Schools and Consultant to the Ukiah Unified School District, Defendants–Appellees.

Nos. 99–15020, 99–17151.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 13, 2000

Filed June 13, 2001

Sandra Rae Benson, Theodore Franklin, Amy D. Martin, Van Bourg, Weinberg, Roger & Rosenfeld, Oakland, California, for the plaintiffs-appellants.

Bradford K. Newman, Jeffer, Mangels, Butler & Marmaro, LLP, San Francisco, California; Jeanine B. Nadel, Deputy County Counsel, Ukiah, California; Richard W. Clopine, Halkides & Morgan, Redding, California, for the defendants-appellees.

Khin Mai Aung, Asian Law Caucus, San Francisco, CA, for the amici curiae.

Before: CANBY, REINHARDT, and FERNANDEZ, Circuit Judges.

Opinion by Judge CANBY; Partial Concurrence and Partial Dissent by Judge REINHARDT.

CANBY, Circuit Judge:

This appeal is an outgrowth of a dispute over the right of union representatives to visit the construction sites of a non-union general contractor in order to inspect for unsafe conditions or violations of prevailing wage policies applicable to governmental construction contracts. The plaintiffs are four representatives of the Bay Counties District Council of Carpenters ("Carpenters Union") located in Northern California. The plaintiffs entered the construction sites of the defendant, Rainbow Construction Company, and refused to depart when asked by Company officials. Rainbow's president effected citizen's arrests of three of the plaintiffs, and all four plaintiffs were subsequently prosecuted for trespass and acquitted.

The plaintiffs then brought this action against Rainbow, its president, the Mendocino County District Attorney, a local school official, and other defendants no longer in issue. The plaintiffs asserted claims for violation of 42 U.S.C. § 1983, on a theory that the private defendants had conspired with the County District Attorney to bring unfounded prosecutions in violation of the plaintiffs' rights under federal labor law and the Constitution. The plaintiffs also alleged state-law claims of false arrest, false imprisonment, and mali-

cious prosecution.[1] The district court granted summary judgment for the defendants on all claims, and assessed sanctions of $75,000 against the plaintiffs' attorneys under Fed.R.Civ.P. 11. The plaintiffs appealed. We now affirm the district court's dismissal of all claims under 42 U.S.C. § 1983. We reverse the dismissal of the state-law claims of false arrest,[2] false imprisonment, and malicious prosecution against Rainbow and its president, and remand for further proceedings. We also reverse the award of Rule 11 sanctions against the plaintiffs' attorneys.

## FACTUAL BACKGROUND

The facts underlying this appeal are rendered more understandable if three legal considerations are kept in mind. First, the plaintiffs in visiting construction sites were relying on *In re Catalano*, 29 Cal.3d 1, 10, 171 Cal.Rptr. 667, 623 P.2d 228, 234 (1981), in which the Supreme Court of California held that, under a statutory exception, the general trespass statute did not apply to "lawful union activity" on the job site. Second, Rainbow and its president are private parties who ordinarily do not act "under color of state law" within the meaning of 42 U.S.C. § 1983. The viability of the plaintiffs' § 1983 claim against the Rainbow defendants accordingly depends entirely upon proof of conspiracy or joint action between the Rainbow defendants and the District Attorney that violated the plaintiffs' federal rights. *See United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir.

1989) (en banc). And third, the plaintiffs recognize that the Mendocino County District Attorney enjoys absolute immunity for decisions made within her prosecutorial authority, *see Imbler v. Pachtman*, 424 U.S. 409, 422–23, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); their § 1983 claim against the District Attorney thus requires proof that she acted outside of her prosecutorial function to the injury of the plaintiffs. With these considerations in mind, we turn to the facts.

In May 1995, the plaintiffs visited two of Rainbow's job sites. One of these sites was the Pomolita Middle School; the other was the Mendocino County Administration Building. The plaintiffs assert that there were two purposes of these visits. First, the plaintiffs were seeking to enforce prevailing wage rates applicable to public construction contracts. Second, the plaintiffs were inspecting health and safety conditions as authorized by the Carpenter's Master Agreement, which they assert was applicable because Rainbow had retained at both sites the services of a union subcontractor that had signed the Carpenter Union's Agreement.[3]

The first visit occurred on May 16, 1995, and it involved no arrests. Three of the plaintiffs, Richard Radcliffe, Charles Taylor, and Jay Streets, went to the Pomolita Middle School site. Prior to their visit, the plaintiffs had been informed by defendant Jack Daniels, a school district official, that they were required to register at the school office whenever they visited a

---

1. The plaintiffs asserted other federal and state-law claims that were also dismissed, but the plaintiffs have abandoned those claims on appeal.

2. Plaintiff Streets, however, was never arrested; we therefore affirm the dismissal of his state-law claim for false arrest.

3. At Pomolita, Rainbow had hired one man who had signed the Carpenter Union's Agreement, who worked on the site about a total of 6 days over the course of the year. At the Mendocino County Administration site, Rainbow had also hired one signatory, though he was not scheduled to report to the site for about another year at the time that the plaintiffs made their May visit.

school site; the plaintiffs accordingly signed in at the Pomolita principal's office. They then proceeded to the job site, where their presence was challenged by Rainbow's president, defendant Peter Richardson. Richardson told the plaintiffs (incorrectly) that there were no union contractors scheduled to perform work on the job, and said that he was leaving to call the police.

Several minutes later, Richardson appeared with police officers, and inquired about the purpose of the plaintiffs' visit. To this inquiry, plaintiff Radcliffe responded only that he was there to conduct "lawful union business." Defendant Daniels of the School District then appeared on the site, responding to a call from Richardson, and stated that he had not given the plaintiffs permission to enter the site. Daniels volunteered to call the Superintendent in an attempt to resolve the situation, and he left to do so. By the time Daniels had returned, the plaintiffs had voluntarily left the site after the police persuaded Richardson not to effect a citizen's arrest on this occasion. The police told the plaintiffs that if Richardson wanted to make a citizen's arrest on such an occasion in the future, they would be obligated to carry out that arrest.

Three days later, plaintiffs Radcliffe and Streets visited another Rainbow site, the Mendocino County Administration Center. Defendant Richardson appeared and asked them to leave. Radcliffe repeated, again without additional explanation, that he was engaged in "lawful union business" and that he would not leave until his business was completed. Richardson told them that they would be arrested if they did not leave, and Streets then left the premises. Radcliffe remained and ultimately the police arrived and took custody of him pursuant to a citizen's arrest by Richardson.[4] He was booked and promptly released without bail.

Less than two weeks later, Radcliffe and Taylor returned to the Pomolita Middle School site to conduct another, nearly identical visit. They stated only that they were on "lawful union business" and refused to leave when asked. Richardson then effected a citizen's arrest of both Radcliffe and Taylor. They were transported to the Ukiah police department, where they were booked and quickly released without bail.

The District Attorney's office subsequently declined to prosecute the trespasses leading to the two arrests, because the two Assistant District Attorneys who had examined the case concluded that the plaintiffs' conduct was not unlawful.

On September 11, 1995, plaintiffs Radcliffe and Andrew Slivka visited Rainbow's Construction site at the Mendocino County Administration Building, apparently to monitor Rainbow for potential violations of the state prevailing wage laws. After checking in at the Administration Building, Radcliffe and Slivka entered the job site. When challenged, Radcliffe stated that he was "engaged in lawful union activities." Richardson arrived and told Radcliffe, "If you'd just tell us what you want, I'll take you through and let you do it." Radcliffe simply repeated that he was on "lawful union business"; both Radcliffe and Slivka refused to leave, and Richardson placed them under citizen's arrest. A county police officer caused them to be jailed for a short time when he learned of the prior arrests.

Following the third arrest, Richardson went to the County District Attorney's Office to seek reconsideration of the District

---

4. During the interval before the police arrived, the site gates were locked after Radcliffe was offered the opportunity to leave, which he declined.

Attorney's decision not to prosecute the May arrests. When Richardson arrived, the Assistant District Attorney who had been in charge of the case was unavailable. Richardson demanded to speak to someone about the matter. At that point, District Attorney Susan Massini came out of her office, introduced herself, and asked if she could help him. Richardson explained that the Radcliffe case had been rejected for prosecution twice before, but that the same conduct was continuing. She told him that she did not know anything about the case, but would retrieve the file from the police department, and make a determination about the prosecution.

Thereafter, Massini decided to charge the plaintiffs with all three instances of criminal trespass. In doing so, she acted rather unusually, doing no legal research to ascertain whether the plaintiffs had a right to be on Rainbow premises, for example. Nor did Massini, before moving ahead with the prosecution, discuss the case with the two attorneys who had declined to prosecute the earlier alleged trespasses.

On April 8, 1996, the trespass trial commenced. At the close of the case against the plaintiffs, the plaintiffs moved for judgment of acquittal. The court granted Streets' motion because Streets had departed when requested and had never been arrested, but the court denied the motions as to the three remaining plaintiffs. The jury subsequently acquitted all three.

The plaintiffs then initiated this action in the federal district court, naming Rainbow Construction Company and its partners as defendants. The complaint also named as defendants Massini and Daniels, along with others who are no longer parties or in issue in this suit. The plaintiffs alleged that the defendants had violated 42 U.S.C. § 1983[5] by conspiring to deny the plaintiffs access to public works construction job sites, in violation of rights "to engage in ... concerted activities" guaranteed to them by § 7 of the National Labor Relations Act. 29 U.S.C. § 157. The plaintiffs also alleged various state law tort claims against Rainbow, Massini, Daniels, and others who are no longer parties.

After two years of discovery, the district court awarded the defendants summary judgment with respect to all claims. It also concluded that the plaintiffs had failed to present any evidence to support their allegation of a pre-arrest conspiracy between the Rainbow defendants and District Attorney Massini; for that reason, it awarded sanctions of $75,000 against the plaintiffs' attorneys under Fed.R.Civ.P. 11. We now affirm the district court's award of summary judgment on all of the § 1983 claims, as well as on some of the state-law claims. We reverse, however, the dismissal of the state-law claims for false arrest (with the exception of the false arrest claim of plaintiff Streets), false imprisonment, and malicious prosecution against the Rainbow defendants. We also reverse the award of sanctions against the plaintiffs' attorneys.

## DISCUSSION

### 1. Claims Under 42 U.S.C. § 1983.

Before reaching the merits of the plaintiffs' claims under § 1983, we must consider a threshold issue that the district court

---

5. 42 U.S.C. § 1983 provides in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

did not address: whether the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, precludes any or all of the plaintiffs' § 1983 claims.

### A. *Cognizability of 42 U.S.C. § 1983 Claims.*

#### (i). *Violation of rights under the NLRA*

■■■ Section 1983 provides a remedy for violation of a federal right, whether founded in the Constitution or federal statute, unless Congress forecloses that remedy "by providing a 'comprehensive enforcement mechanis[m] for protection of [that] federal right.'" *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (*"Golden State II"*) (quoting *Smith v. Robinson,* 468 U.S. 992, 1003, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)).[6] Because the plaintiffs base their § 1983 claim primarily on the violation of their federal right of concerted action under § 7 of the NLRA, Rainbow argues that the NLRA enforcement scheme precludes a remedy under § 1983. This argument is clearly insufficient when applied to the governmental defendants. As *Golden State II* itself makes clear, Congress in the NLRA has provided "no comprehensive enforcement scheme for preventing state interference with federally protected labor rights that would foreclose the § 1983 remedy." *Id.* at 108–09, 110 S.Ct. 444. It follows,

therefore, that the § 1983 claims against the public defendants are not precluded.

■■■ The § 1983 claim against the Rainbow defendants is a different matter. An employer's interference with the right of employees under § 8 of the NLRA is an unfair labor practice. 29 U.S.C. § 158(a)(1). To the extent that the plaintiffs' § 1983 claim is based on an alleged violation of their rights under § 7 of the NLRA, therefore, it qualifies as an ordinary subject of unfair labor practice proceedings before the National Labor Relations Board. In *NLRB v. Calkins,* 187 F.3d 1080 (9th Cir.1999), for example, we granted enforcement of a Board order against an employer for effecting a citizen's arrest of nonemployee union representatives handbilling on private property to which state law guaranteed access. Because the plaintiffs' claim could have been brought before the Board as an unfair labor practice, it is not cognizable as a § 1983 claim, because "the National Labor Relations Board ... has exclusive jurisdiction to prevent and remedy unfair labor practices by employers and unions." *Golden State II,* 493 U.S. at 108, 110 S.Ct. 444; *see also Hobbs v. Hawkins,* 968 F.2d 471, 478–79 (5th Cir.1992) (dismissing a § 1983 action brought against a private employer by a union member when the union member could have presented the claim to the NLRB as an unfair labor practice).[7]

---

6. Rainbow improperly labels this doctrine as one of *Garmon* preemption. *See San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). *Garmon* preemption, however, refers to the preemption of state law by the NLRA. The question whether a federal remedy under § 1983 is precluded by another federal statute is governed by the doctrine of *Golden State II,* not *Garmon. See Smith v. Nat'l Steel & Shipbuilding Co.,* 125 F.3d 751, 756 (9th Cir. 1997).

7. The plaintiffs argue that the federal court can offer a § 1983 remedy in these situations because of the collateral issue exception. *See Connell Constr. Co. v. Plumbers & Steamfitters,* 421 U.S. 616, 626, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). This exception to *Garmon* preemption provides that the federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies. *See id.* The collateral issue exception is, however, of no help to the plaintiffs here because their

■ Our conclusion is not altered by the fact that the plaintiffs alleged that the Rainbow defendants conspired with state actors to violate their rights under § 7 of ethe NLRA. There is nothing about the presence of other actors that would defeat the jurisdiction of the NLRB over Rainbow as an employer which interfered with the plaintiffs' § 7 rights. An employer's interference with § 7 rights will often be effectuated with the aid of state actors. *See, e.g., Calkins,* 187 F.3d at 1084. It would frustrate Congress's comprehensive enforcement scheme in the NLRA to permit an employer's unfair labor practice to be adjudicated in federal court, rather than before the NLRB, simply because of an allegation that the employer conspired with state actors. The claimed violation of right is still interference by an employer with § 7 rights-an unfair labor practice within the exclusive jurisdiction of the NLRB. *See Hobbs v. Hawkins,* 968 F.2d at 475–79.

#### (ii). *Violation of constitutional rights*

■ The NLRA does not provide, of course, a comprehensive scheme for the vindication of the plaintiffs' constitutional rights. There is accordingly no preemption of the plaintiffs' § 1983 constitutional claims against the Rainbow defendants. *See, e.g., Phelps Dodge,* 865 F.2d at 1540; *see also Hobbs v. Hawkins,* 968 F.2d at 480. Even more clearly, there is no pre-emption of the plaintiffs § 1983 constitutional claims against the public defendants.

The plaintiffs, however, have given virtually no attention on appeal to their allegation that their constitutional rights were violated by either Rainbow or the public defendants. By concentrating almost exclusively on the alleged violation of their rights under the NLRA, the plaintiffs have come perilously close to waiving all of their constitutional claims. Construing their briefs most favorably, we conclude that their claims of false arrest and false imprisonment without probable cause may be viewed as asserting violations of the Fourth Amendment.[8]

#### B. *Merits of the Cognizable § 1983 claims.*

#### (i) *Massini*

■ The primary § 1983 claim against Massini is that she conspired to prosecute the plaintiffs with the intent and purpose of depriving them of their rights under the NLRA. Massini is absolutely immune, however, from liability arising from her decision to prosecute. *See Imbler v. Pachtman,* 424 U.S. at 423–26, 96 S.Ct. 984.

■ The plaintiffs concede that most of Ms. Massini's conduct was absolutely immune, but maintain that some of her conduct fell outside of the scope of her prosecutorial role. With one possible ex-

§ 1983 claim is not independent of their claim under § 7 of the NLRA.

8. The plaintiffs have failed to raise a constitutional issue regarding their claim of malicious prosecution. The only reference to the Constitution in that connection was a comment at the end of one sentence that their arrests and prosecution in violation of the NLRA and state law also were "so blatantly lacking in legal justification as to render them a violation of the plaintiffs' constitutional due process rights as well." No further elaboration

or argument is offered in support of this bare statement, and we accordingly deem the constitutional argument waived. *See Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1069 n. 18 (9th Cir.2000) (an appellant waives a contention by failing to support it by argument). In any event, the § 1983 claim based on malicious prosecution suffers from the same defects as the constitutionally-based false arrest and false imprisonment claims, discussed in the text that follows.

ception, we find no merit in that argument. Massini did not exceed her prosecutorial role by sending plaintiff Streets a letter informing him that he had been charged with trespass, and directing him to present himself at the police station for arrest and booking under the threat of a bench warrant. A prosecutor's activities in connection with the preparation and filing of charging documents, including a motion for an arrest warrant, are protected by prosecutorial immunity. *See Kalina v. Fletcher,* 522 U.S. 118, 129, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). The letter to Streets was necessarily incidental to those duties.

■ The plaintiffs also contend that Massini acted beyond the scope of her prosecutorial powers when, in 1996, she saw Radcliffe glaring at her from a street corner near the courthouse, and she asked the police to question him because she thought he might be carrying a bomb. The police questioned Radcliffe on the street. Assuming that such conduct exceeded the scope of Massini's prosecutorial role, we find nothing in the record from which a reasonable trier of fact could find that Massini's request to the police violated Radcliffe's rights under the Fourth Amendment or the NLRA.

As will be more fully explained in the discussion of the claims against the Rainbow defendants, Massini had nothing to do with the arrest and detention of the plaintiffs. There is no evidence to support a claim of constitutional violation by her in that connection. Summary judgment in her favor was accordingly required.

(ii) *Daniels*

The evidence that Daniels conspired to violate the plaintiffs' § 7 rights was wholly insufficient to forestall summary judgment. The plaintiffs were required to produce "concrete evidence" of an agreement or "meeting of the minds" between Daniels and others to violate the plaintiff's rights. *See Phelps Dodge,* 865 F.2d at 1540–41, 1543. This the plaintiffs have not done.

■ Daniels sent a letter to Radcliffe stating that School District policy required school visitors to register at the school office and requesting Radcliffe to follow this rule in the future when visiting any of the school district sites. The plaintiffs argue that this letter raises an inference of conspiracy because it arrived one week after Richardson wrote the plaintiffs a letter threatening them with arrest for coming on to Rainbow sites. The plaintiffs contend that Daniels' letter gave them permission to enter school sites; they see further evidence of conspiracy in the fact that Daniels, when he was called to the job site by Richardson and asked by police whether he had given permission, denied that he had done so. (Daniels then volunteered to call the Superintendent in an attempt to resolve the situation.) Finally, argue the plaintiffs, Daniels wrote a report of the incident.[9]

This evidence is wholly insufficient to present a jury question on the existence of a conspiracy to violate the plaintiffs' constitutional rights. The plaintiffs bore the burden of persuasion on the conspiracy issue, and Daniels has pointed to a number of shortfalls in the plaintiffs' conspiracy allegations. *See Phelps Dodge,* 865 F.2d at 1543. For example, the plaintiffs have adduced no evidence tying Daniels to the arrests effected by Rainbow. Indeed, the plaintiffs have not produced a shred of evidence to show that Daniels was even

---

**9.** The plaintiffs also point to a few other pieces of evidence that do not merit discus- sion.

*aware* of the arrests at the time that they took place. Nor have the plaintiffs adduced any ·evidence demonstrating that Daniels somehow ratified these arrests. The district court accordingly did not err in concluding that the plaintiffs had failed to raise a triable issue of conspiracy on the part of Daniels. The summary judgment in his favor on the § 1983 claim is affirmed.

(iii) *The Rainbow Defendants*

██ The Rainbow defendants are not state actors. Because § 1983 creates liability for deprivations of federal rights "under color of state law," the Rainbow defendants cannot be liable unless they conspired or acted jointly with state actors to deprive the plaintiffs of their constitutional rights. *See Phelps Dodge,* 865 F.2d at 1540.

As we have already pointed out, there is insufficient evidence to raise a triable issue that Daniels conspired with the Rainbow defendants. The constitutional claims against Rainbow therefore depend on evidence that the Rainbow defendants conspired with Massini to violate the plaintiffs' Fourth Amendment rights. That evidence is lacking.

The theory on which the plaintiffs pleaded and originally presented their case to the district court was that Richardson or other Rainbow agents conspired with Massini *prior to* the arrests. No evidence was offered to support this theory and it is quite inconsistent with the failure of the District Attorney's office to prosecute the first two charges. Indeed, the utter failure to support the allegation of a pre-arrest conspiracy led the district court to sanction the plaintiffs' attorneys under Fed.R.Civ.P. 11.[10]

██ The only direct evidence of any contact between the Rainbow defendants and Massini occurred *after* the third arrest, when Richardson went to the District Attorney's office to inquire why the earlier arrests had not led to prosecutions. When an assistant who had handled one of the earlier cases proved unavailable, Richardson insisted on talking to someone. Massini then introduced herself and asked if she could help. Richardson said that the earlier two arrests had not been prosecuted, but that the conduct was continuing and there had been another arrest. Massini said that she knew nothing about the matter, but would look into it. That is the entire encounter, according to the uncontradicted evidence of Massini and Richardson. This unremarkable exchange between a complaining citizen and a prosecutor does not amount to a conspiracy to deprive the plaintiffs of their Fourth Amendment rights.

The plaintiffs point to Massini's subsequent zeal in prosecuting, and her lack of research or discussion with her deputies who had dealt with the earlier cases, as evidence of conspiracy. The plaintiffs also suggest that one motive of Massini was to curry Richardson's support for Massini's upcoming re-election bid. But zealous prosecution, even careless or improperly motivated prosecution, is not sufficient to raise a triable issue of conspiracy with the citizen complainant. A relationship of cause and effect between the complaint and the prosecution is not sufficient, or every citizen who complained to a prosecutor would find himself in a conspiracy. The plaintiffs must provide evidence of "an agreement or meeting of the minds to violate constitutional rights." *Id.* at 1540–

10. This sanction is the subject of the consolidated appeal, and is addressed later in this

opinion.

784

41 (internal quotation marks omitted). Here, there was insufficient evidence to raise a triable issue of such an agreement.

The plaintiffs rely on *Phelps Dodge*, but that case is easily distinguishable on its facts. In that case, we held that the plaintiff union and strikers had presented a triable issue of conspiracy by a great deal of evidence, including: (1) the fact that many of the law enforcement officials who had broken up the strike held positions with Phelps Dodge; (2) Phelps Dodge managers had met with the sheriff to discuss the upcoming arrests; a Phelps Dodge representative stated that he hoped that bail would be set high because he "wanted those people off the streets," *id.* at 1544; the sheriff said that he planned to ask for $15,000 bail for each striker; the sheriff and the Phelps Dodge representatives then together went over a list of the persons to be arrested; (3) the justice of the peace, who was a Phelps Dodge employee, then issued warrants without probable cause and set bail at $15,000 for each striker without inquiring into any facts concerning the appropriateness of bail; and (4) there were regular meetings and a high degree of cooperation between Phelps Dodge representatives and law enforcement personnel throughout the strike; Phelps Dodge security personnel issued instructions to sheriff's deputies concerning treatment of picketers and strikebreakers.

Nothing approaching this evidence of agreement and concerted action was presented in the case before us. Moreover, the alleged interference with the plaintiffs' Fourth Amendment rights arose from arrests that were perfected before anyone from Rainbow had met with Massini. In light of the absence of any probative evidence of agreement or concerted action which might lend "color of state law" to Rainbow's actions, the district court properly awarded summary judgment for the Rainbow defendants on all of the § 1983 claims.

2. *State Tort Claims.*

A. *Preemption.*

A threshold issue is also presented with regard to the plaintiffs' state-law tort claims of false arrest, false imprisonment, and malicious prosecution. Rainbow argues that all of these claims are preempted under the doctrine of *San Diego Building Trades Council v. Garmon*, 359 U.S. at 245, 79 S.Ct. 773. *Garmon* held that state "causes of action are presumptively preempted if they concern conduct that is actually or arguably either prohibited or protected by the [NLRA]." *Belknap v. Hale*, 463 U.S. 491, 498, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983) (citing *Garmon*, 359 U.S. at 245, 79 S.Ct. 773).

■■■ *Garmon*'s possible application to this case raises some exquisite questions. The general rule is that § 7 of the NLRA protects concerted activity, but it does not confer on non-employees the right to conduct that activity on the employer's property, unless there is no other means of reaching the employees. *See Lechmere, Inc. v. NLRB*, 502 U.S. 527, 538, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992). Thus, when a union's picketing activities trespass on an employer's property, the employer ordinarily may maintain a trespass action against the union; the trespass claim is not preempted even though the union's picketing was arguably prohibited or protected by federal law. *See Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 207, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). The property right underlying the law of trespass, of course, is a matter of state law.

■■■ We conclude that the state-law torts of false arrest, false imprisonment,

and malicious prosecution arising out of such a trespass arrest are similarly not preempted by the NLRA. Freedom of citizens from false arrest, false imprisonment, and malicious prosecution "touch[] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of power to act." *Garmon,* 359 U.S. at 243–44, 79 S.Ct. 773. Thus false arrest, false imprisonment, and malicious prosecution are similar to torts of threatened violence, traditionally held not to be preempted, *see Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958), or intentional infliction of emotional distress, and defamation, both of which the Supreme Court has held to be excepted from *Garmon*'s preemption rule even though they involve conduct arguably protected or prohibited by the NLRA. *See Farmer v. United Brotherhood of Carpenters, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (intentional infliction); *Linn v. United Plant Guard Workers, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (defamation).

Rainbow contends, however, that a peculiar twist in the California trespass law renders preemption appropriate in this case. The State's trespass law makes it a misdemeanor to refuse to leave property when asked by the owner, but it encompasses an exception for "persons engaged in lawful labor union activities which are permitted to be carried out on the property by the California Agricultural Labor Relations Act ... or by the National Labor Relations Act." Cal.Penal Code § 602(n). Thus, safety inspections by un-

ion representatives at worksites cannot be criminally prosecuted as trespasses. *Catalano,* 29 Cal.3d at 4, 171 Cal.Rptr. 667, 623 P.2d 228. California's question of state law thus includes a reference to federal law.[11]

The result of this reference in this case, Rainbow argues, is that the validity of the plaintiffs' claims of false arrest, false imprisonment, and malicious prosecution largely turns on whether the union activities carried on by the plaintiffs were, apart from their location, protected by § 7 of the NLRA. Rainbow argues that the three claims therefore lie properly within the exclusive jurisdiction of the NLRB. We agree that the arrests and attendant imprisonment of the plaintiffs could form the basis of an unfair labor practice complaint before the NLRB. Indeed, in *NLRB v. Calkins,* 187 F.3d at 1085–86, we upheld an NLRB ruling that an employer committed an unfair labor practice by effecting a citizen's arrest of non-employee union handbillers on the employer's property to which state law guaranteed access.

The fact that a state tort may also constitute an unfair labor practice, however, does not inevitably cause preemption of the state claim. In *Farmer,* for example, the Supreme Court held that state tort claims were not preempted even though the plaintiff could have asserted some of them as unfair labor practice charges. *See Farmer,* 430 U.S. at 303–04, 97 S.Ct. 1056. The Court held that "the potential for interference [with the federal labor scheme] is insufficient to counterbalance the legitimate and substantial interest of the State in protecting its citizens." *Id.* at 304, 97 S.Ct. 1056. Similarly, the Supreme Court held a state defamation claim not to

---

11. It is true that *Catalano* did not focus on federal law in determining that customary union activity was excepted from the criminal trespass statute, but the California Supreme Court also made it clear that, under § 602(n),

"union activity protected by state or federal labor law clearly does not violate" the criminal trespass statute. *Catalano,* 29 Cal.3d at 13–14, 171 Cal.Rptr. 667, 623 P.2d 228 (internal quotation marks omitted).

be preempted even though the defamatory statements might also constitute an unfair labor practice. *See Linn*, 383 U.S. at 63, 86 S.Ct. 657.

One consideration leading the Supreme Court to find no preemption in these cases is that the state court deciding the tort claim would focus on different issues from those central to the unfair labor practice claim. Thus defamatory speech might be an unfair labor practice, but the NLRB would focus on the coercive effect of that speech on a representation election, and would not be concerned with its defamatory character. *See id.* Indeed, the Court has stated the test of preemption in such circumstances as follows:

> [A] critical inquiry in applying the Garmon rules, where the conduct at issue in the state litigation is said to be arguably prohibited by the Act and hence within the exclusive jurisdiction of the NLRB, is *whether the controversy presented to the state court is identical with that which could be presented to the Board.*

*Belknap, Inc. v. Hale*, 463 U.S. at 510, 103 S.Ct. 3172 (emphasis added). Here, this test is not met. The state court must decide whether the plaintiffs were in fact falsely arrested, imprisoned, and maliciously prosecuted. It is true that, in deciding that question, the state court is likely to focus in part on whether the plaintiffs were engaged in lawful union activity protected by the NLRA, but it will also focus on state concerns of accommodating such union activity with the state-law rights of private property—an accommodation that has led California to limit the employer's property rights well beyond the degree required by federal law under *Lechmere*, 502 U.S. at 538, 112 S.Ct. 841. *See Catalano*, 29 Cal.3d at 14–17, 171 Cal. Rptr. 667, 623 P.2d 228. Were the Board, on the other hand, to consider an unfair labor practice charge arising from the same conduct, it would focus on whether the employer had interfered with the plaintiffs' § 7 rights, regardless of whether there had been an arrest, imprisonment or prosecution. The issues before the state court and the Board would not be identical.

It is true that the state court is likely to be called upon to determine whether the plaintiffs were engaged in "lawful union activity"—a finding that might duplicate or even contradict one that could be made by the Board in an unfair labor practice proceeding. We also recognize that the plaintiffs here, unlike the employer in *Sears*, have the right to file an unfair labor practice charge with the Board. These factors, considered alone, would militate in favor of preemption. *See Sears*, 436 U.S. at 202, 98 S.Ct. 1745. But there is little "realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices," *id.* at 198, 98 S.Ct. 1745, because the Board ordinarily leaves to the State the question whether non-employee union activity may be conducted on the employer's property. *See Lechmere*, 502 U.S. at 538, 112 S.Ct. 841. In the present case, for example, the state law claims may turn substantially on the question whether a union representative, to avoid arrest for trespass, must specify to the employer what union activity is proposed on the employer's property—a question that the State is free to determine just as it is free to exclude most protected activity entirely from the employer's property under *Lechmere*.

The State also has a substantial interest in protecting its citizens from false arrest, false imprisonment, and malicious prosecution. *See Linn*, 383 U.S. at 61–62, 86 S.Ct. 657 (state interest in protecting citizens from defamation justifies exemption from

*Garmon* preemption). False arrest, false imprisonment, and malicious prosecution may cause substantial damages, and even lead to punitive damages, neither of which the Board could award to the plaintiffs in an unfair labor practice proceeding. *See id.* at 63–64, 86 S.Ct. 657. The fact that damages may not have been substantial in this particular case does not favor preemption; we must determine exceptions from *Garmon* preemption for "appropriate *classes* of cases." *Farmer*, 430 U.S. at 296, 97 S.Ct. 1056 (emphasis added).

> "(W)e (cannot) proceed on a case-by-case basis to determine whether each particular final judicial pronouncement does, or might reasonably be thought to, conflict in some relevant manner with federal labor policy. This Court is ill-equipped to play such a role and the federal system dictates that this problem be solved with a rule capable of relatively easy application, so that lower courts may largely police themselves in this regard."

*Id.* at 296 n. 7, 97 S.Ct. 1056 (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 289–90, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971)). Similarly, it is not practical here to make preemption depend on the degree of damages that may follow from particular false arrests, false imprisonments, or malicious prosecutions. The State's interest in the torts, the potential damages, and the lack of interference with federal labor policy render preemption inappropriate in this class of cases arising from alleged trespasses on an employer's property. We accordingly reject Rainbow's preemption contentions.

12. The plaintiffs have not pursued on appeal their state-law claims against the public defendants.

13. The district court did not discuss the false imprisonment claim separately, but appears to have lumped it with the false arrest claims.

## B. *Merits of the State Law Claims Against the Rainbow Defendants.*[12]

▮ The false arrest claim of plaintiff Streets against the Rainbow defendants fails because there is no evidence that Rainbow effected an arrest of Streets. The remainder of the false arrest claims, and the false imprisonment[13] and malicious prosecution claims, were rejected by the district court on the ground of collateral estoppel; the district court held that the state court's denial of a directed verdict in the criminal trial adjudicated the issue of probable cause adversely to the plaintiffs.

▮ The plaintiffs concede that lack of probable cause is an element of false arrest[14] and malicious prosecution but argue that probable cause was not adjudicated when the state court denied the plaintiffs' motion for a directed verdict in the criminal trial. We need not decide that question, however, because collateral estoppel does not apply when the ruling in issue was not subject to appeal. *See Anderson–Cottonwood Disposal Serv. v. Worker's Comp. Appeals Bd.*, 135 Cal. App.3d 326, 332, 185 Cal.Rptr. 336 (1982); *see also Luben Indus., Inc. v. United States*, 707 F.2d 1037, 1040 (9th Cir.1983). In this case, the plaintiffs could not have appealed the denial of their motion to acquit because the interlocutory order could not be appealed, *see People v. Rocovich*, 269 Cal.App.2d 489, 490, 74 Cal.Rptr. 755 (1969), and the subsequent acquittal by the jury precluded the plaintiffs from raising the issue in an appeal from the final judgment. *See Anderson–Cottonwood*, 135 Cal.App.3d at 332–33, 185 Cal.Rptr. 336

14. *But see Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 591 & n. 4, 156 Cal.Rptr. 198, 595 P.2d 975 (1979).

(plaintiffs not collaterally estopped because, as prevailing parties in prior litigation, they could not secure appellate review of ruling). The cases relied on by the Rainbow defendants are not in point: in *People v. Trevino*, 39 Cal.3d 667, 695–96, 217 Cal.Rptr. 652, 704 P.2d 719 (1985), the prosecution appealed and the defendant was allowed to support the judgment by urging error in denying the motion for acquittal; in *People v. Smith*, 64 Cal. App.4th 1458, 1464, 76 Cal.Rptr.2d 75 (1998), the defendant was convicted and was able to argue improper denial of a motion for acquittal as part of his appeal from a final judgment.

The district court accordingly erred in holding that the plaintiffs were collaterally estopped from pursuing their false arrest claims and malicious prosecution claims against the Rainbow defendants. The district court also dismissed the false imprisonment claim (asserted only by plaintiff Radcliffe) without discussion, apparently grouping it with the false arrest claims. The plaintiffs assert that probable cause is not an element of a false imprisonment claim. *See Collins v. Owens*, 77 Cal. App.2d 713, 716, 176 P.2d 372 (1947). We need not address that issue, because we are reversing the district court's ruling that the plaintiffs were estopped to deny probable cause. We reverse the dismissal of the false imprisonment claim along with the dismissal of the false arrest claims. We remand the false arrest claims (other than Streets', which we have affirmed), the

false imprisonment claim, and the malicious prosecution claims to the district court for further proceedings. Our reversal is based solely on the error in applying collateral estoppel; we express no opinion regarding the merits of those claims, nor regarding their appropriateness for determination upon a renewed motion for summary judgment.

## RULE 11 SANCTION

The final issue we must address involves the district court's award of Rule 11 sanctions against the plaintiffs' attorneys. The district court awarded the defendants $75,000 after the defendants moved for sanctions under Fed R. Civ. P. 11(c)(1)(A).[15] The district court concluded that the sanctions were appropriate in light of its finding that the plaintiffs, in alleging a conspiracy between Rainbow and the County District Attorney's Office, had failed to identify allegations that were "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). Without passing judgment on the correctness of this finding, we conclude that the district court abused its discretion in granting an award of sanctions.[16]

Rule 11(c)(1)(A) provides strict procedural requirements for parties to follow when they move for sanctions under Rule 11. To comply with the Rule, Rainbow Construction was required to serve its

---

**15.** Fed.R.Civ.P. 11(c)(1)(A) provides:

A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or

denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion.

**16.** We review the award of Rule 11 sanctions under the abuse of discretion standard. *See Barber v. Miller*, 146 F.3d 707, 709 (9th Cir. 1998).

Rule 11 motion on the plaintiffs with a demand for retraction of the allegedly offending allegations, and then to allow the plaintiffs at least twenty-one days to retract the pleading before filing the motion with the court. *See* Fed.R.Civ.P. 11(c)(1)(A). Rainbow did not follow this procedure. Rainbow filed its Rule 11 motion along with a motion for summary judgment with the court on August 18, 1998. Rainbow did not serve the plaintiffs with the motion in advance of filing and thus did not comply with the twenty-one day advance service provision. Having not followed this procedure, Rainbow was not entitled to obtain an award from the plaintiffs.

The district court concluded that, even though the defendants did not give twenty-one day advance service to the plaintiffs, a "literal application of the safe harbor provision" was unnecessary in this case. The court decided that because Rainbow had filed a Rule 11 motion in response to the plaintiff's first amended complaint, and three months had passed between the motion and the court's order concerning sanctions, the plaintiffs and their attorneys had been given adequate notice and opportunity to withdraw the challenged allegation. As a result, the court ruled that Rule 11(c)(1)(A)'s "safe harbor" provision had been satisfied, notwithstanding the lack of advance service on the plaintiffs.

This view failed to take proper account of our decision in *Barber v. Miller*, 146 F.3d 707 (9th Cir.1998). In *Barber*, we held that the procedural requirements of Rule 11(c)(1)(A)'s "safe harbor" are mandatory. *Id.* at 710–11. Thus, in *Barber*, we concluded that, although a defendant had given informal warnings to the plaintiffs threatening to seek Rule 11 sanctions, these warnings did not satisfy the strict requirement that a motion be *served* on the opposing party twenty-one days prior

to filing. *Id.* at 710. It is the service of the motion that gives notice to a party and its attorneys that they must retract or risk sanctions. In light of our holding in *Barber*, the fact that the plaintiffs had advance warning that Rainbow objected to their conspiracy allegation did not cure Rainbow's failure to comply with the strict procedural requirement of Rule 11(c)(1)(A). The district court abused its discretion when it concluded otherwise.

■ We reject Rainbow's argument that the district court's order for sanctions can be interpreted as a Rule 11 motion on the court's own initiative, pursuant to Fed. R.Civ.P. 11(c)(1)(B). This provision does not require twenty-day advance notice. Fed.R.Civ.P. 11(c)(1)(B). We reject Rainbow's contention because it was Rainbow, not the court, that initiated the award of sanctions. The district court's discussion of the safe harbor provision in its order concerning sanctions serves to emphasize this point. It would render Rule 11(c)(1)(A)'s "safe harbor" provision meaningless to permit a party's noncompliant motion to be converted automatically into a court-initiated motion, thereby escaping the service requirement.

Because Rainbow did not follow the mandatory service procedure of Rule 11(c)(1)(A), we reverse the award of sanctions.

## CONCLUSION

We affirm the district court's dismissal of all of the plaintiffs' § 1983 claims. We reverse the dismissal of the false arrest claims of all of the plaintiffs except Streets against the Rainbow defendants; we also reverse the dismissal of the false imprisonment claim and the malicious prosecution claims against the Rainbow defendants; we remand these matters to the district court for further proceedings. We affirm

the dismissal of all of the plaintiffs' remaining claims.

We reverse the award of Rule 11 sanctions against the plaintiffs' attorneys.

Massini and Daniels are entitled to their costs on appeal. The remaining parties will bear their own costs for the consolidated appeals.[17]

**No. 99–15020 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**No. 99–17151 REVERSED.**

REINHARDT, Circuit Judge, concurring in part and dissenting in part:

I fully agree with Judge Canby's analysis as to all defendants and causes of action save the § 1983 claim against Richardson. I would hold that the plaintiffs have presented sufficient evidence to raise a triable issue of fact as to whether Richardson and Massini formed an agreement at their meeting in September 1995 to deprive the union officials of their constitutional rights by prosecuting them without probable cause.[1]

To establish a conspiracy, a plaintiff must demonstrate the existence of "an agreement or meeting of the minds" to violate the plaintiffs' civil rights. *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir.1989) (en banc). We have recognized that "[d]irect evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir.1999). It will therefore almost always be necessary to infer such agreements from circumstantial evidence such as the actions of the defendants. *Id.* For example, a showing that the alleged conspirators have committed acts that are "unlikely to have been undertaken without an agreement" may allow a jury to infer the existence of a conspiracy. *Id.* at 1301 (citing *Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir.1991)). The possibility that other inferences could be drawn that would provide an alternate explanation for the defendants' actions does not entitle them to summary judgment. *Id.* at 1303 (citing *Phelps Dodge*, 865 F.2d at 1542 (inference need not be most likely but merely a "rational" or "reasonable" one)). Moreover, we have held that "[w]hether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Id.* at 1301 (quotations omitted).

I believe that District Attorney Massini's most unusual actions in prosecuting this trespass case permit the inference of

---

**17.** The motion of the plaintiffs to file an oversized opposition to Rainbow's motion for sanctions is granted, and the opposition is ordered filed. The motions of the plaintiffs and of the Rainbow defendants for damages, sanctions, and double costs on appeal are denied. The motion of the plaintiffs to strike portions of Rainbow's supplemental excerpts of record is granted in part and denied in part; the court has disregarded portions of the excerpts that were not before the district court. The motion of the Asian Law Caucus and National Employment Lawyers Association for leave to file a brief amicus curiae is granted, and the brief is ordered filed.

**1.** I do not agree with the majority's conclusion that the plaintiffs have failed adequately to raise a constitutional issue regarding their claim of malicious prosecution. I do, however, agree that the plaintiffs have failed to present any evidence that Massini conspired with any of the Rainbow defendants *before* the arrests.

a conspiracy between Massini and Richardson to deprive the defendants of their civil rights. Although neither the Assistant District Attorney nor the Deputy District Attorney could remember another case in which Massini overruled their decision on a misdemeanor filing, she countermanded the determination of her subordinates that prosecution in this case was not warranted because the union officials' conduct was not unlawful. She did no legal research and did not discuss the case with the two charging district attorneys before deciding to prosecute, and alleges that she has never read *In re Catalano*, the leading case governing the exception from the trespass statute for lawful union activity. Moreover, although it was the practice for the charging deputy district attorney to sign criminal complaints, Massini personally signed the complaints against the plaintiffs and directed that "no deals" with the defense be offered or accepted in the case. While there may be other, more likely explanations for Massini's actions, I believe that the plaintiffs have presented sufficient evidence to defeat summary judgment by showing that one possible inference a reasonable jury might draw from her conduct is that she formed an agreement in her meeting with Richardson to deprive the plaintiffs of their civil rights. *See Phelps Dodge*, 865 F.2d at 1542.

The majority opinion raises the specter of finding a conspiracy every time a citizen's complaint to a prosecutor results in a prosecution. However, the district attorney's actions in this case were highly unusual; so unusual, in fact, that it provoked a grand jury investigation that ultimately resulted in a report censuring Massini for her "lack of research" and "questionable decision to proceed with prosecution."

Surely district attorneys can and have conspired with employers or others to suppress the rights of individuals. To find evidence of such a conspiracy in one extreme case would not intimidate district attorneys, frustrate the goals of law enforcement, interfere with employers' First Amendment rights, or discourage individuals from filing complaints. Rather, it would help prevent and deter governmental participation in conspiracies to violate the constitutional rights of workers and minorities.